In re HOLMES' ESTATE.

COOK et al. v. MORRISON et al.
No. 35959.

Supreme Court of Oklahoma.
May 4, 1954.

friends among her younger neighbors. She had a sister to whom she willed $1,000 in her original will. Her husband had predeceased her and she had no children of her own. She became ill in 1945 and was admitted to the Watonga Hospital about May 24, 1945, where she executed all of the instruments mentioned herein.

■ The rule is well established that where a will has been admitted to probate the burden of proof rests upon contestants to establish lack of testamentary capacity. It is also true that this Court will not disturb a judgment of the trial court admitting a will to probate unless found to be against the clear weight of the evidence. It is our duty to weigh all of the evidence in the record.

Testamentary capacity, or capacity to make a will is often not an easy question to decide. There is no very definite yardstick by which to measure such capacity. The law allows a very wide range of evidence upon this question, and the opinion of laymen as well as physicians who had an opportunity to observe the deceased whose mental capacity is challenged, is admissible.

There is no definite time before and after the date of the execution of the instrument challenged when a witness must have seen and had an opportunity to observe the deceased in order to qualify as a witness on the mental capacity of deceased to execute a valid will. However, greater weight is generally given to the opinion of those who had an opportunity to observe the deceased at or near the time of the execution of the challenged will or codicil.

In this case the proponents rely largely upon the testimony of two doctors and a registered nurse who were present when the codicil of July 10, 1945, was executed and all of whom signed it as witnesses.

The contestants produced witnesses who had been friends and neighbors of Mrs. Holmes for many years and some of whom had visited her often during her stay in the hospital, both before and after the execution of the codicil. One of them had been a witness when Mrs. Holmes executed her original will on June 21, 1945 and admitted

Elam & Crowley, Enid, Fred Shirley, Watonga, for plaintiffs in error.

R. H. Morgan, Watonga, for proponent, defendant in error.

HALLEY, Chief Justice.

The plaintiffs in error, James P. Cook and others, have presented a single proposition on this appeal. It involves the competency of Frances L. Holmes, who died on September 16, 1945, to execute a valid codicil to her original will on July 10, 1945. Her original will, executed June 21, 1945 had been admitted to probate and its validity is not questioned here, and two codicils executed August 15 and August 21, 1945 were denied probate and are not here involved.

Plaintiffs in error are related by blood to decedent. The proponent of the codicil of July 10, 1945, Ward Morrison, Jr., is a young man whose family lived near Mrs. Holmes in Geary, Oklahoma. He had known and had been one of her young friends all of his life. By the codicil involved he was made executor without bond, and given the residue of her estate, which was mentioned but not disposed of in her original will of June 21, 1945.

Mrs. Holmes had lived in Geary for many years and appears to have cultivated many

her mental capacity at that time, which was only about twenty days prior to her execution of the codicil here involved.

A careful consideration of all the evidence shows that Mrs. Holmes was slightly over seventy years of age and very sick when she entered the hospital in May, 1945 and gradually grew weaker physically and mentally until her death in September, 1945.

It is also clear that up to within some two weeks before her death she had lucid intervals during which she was mentally alert and fully capable of understanding the nature and effect of her act and of knowing her relatives and friends and the nature, extent and approximate value of her property.

The proper execution of the codicil is not now questioned. It leaves before us the question of her mental condition on July 10, 1945, when she executed the codicil of that date. Did she have testamentary capacity at that time?

This Court has often expressed its opinion as to the correct interpretation of the term "testamentary capacity."

In Slater v. Phipps, 193 Okl. 267, 143 P.2d 133, it was said:

"Testamentary capacity, or the lack thereof, is a question of fact. There is no rule by which it may be determined, with precision, where capacity ends and incapacity begins, but this question should be determined from all of the facts and circumstances of each particular case; and, where the evidence fairly and reasonably supports the finding of testamentary capacity, the same will not be disturbed on appeal.

"Ordinarily, as generally stated, the test of testamentary capacity is the testator's capacity to understand the effect and consequence of his act, at the time the will is executed.

"A presumption of sanity goes with everyone, and the burden of proving unsoundness of mind in a will contest rests on the contestants."

Again in Moore v. Glover, 196 Okl. 177, 163 P.2d 1003, the rule was announced as follows:

"A testator has a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property, and his relations to the persons around him, to those who naturally have some claim to his remembrance and to those in whom and the things in which he has been chiefly interested. He must understand the act which he is doing and the relation in which he stands to the objects of his bounty and to those who ought to be in his mind on the occasion of making a will."

It was also said in Amos v. Fish, 193 Okl. 406, 144 P.2d 967, 968, that:

"In a will contest case, where due execution and attestation are established, a presumption of testamentary capacity arises, and the burden of proving unsoundness of mind of the testator is upon the contestant."

In Harden v. Harden, 192 Okl. 131, 134 P.2d 351, the rule relative to the duty of this Court where there is an appeal from a judgment admitting a will to probate is announced as follows:

"On appeal from judgment admitting will to probate, when contest was on the grounds of undue influence and lack of testamentary capacity, this court will review the record, but will not reverse unless finding and judgment is clearly against the weight of the evidence."

With the foregoing rules in mind we shall consider the evidence for and against the judgment of the trial court holding that Mrs. Holmes had sufficient testamentary capacity on July 10, 1945, when she executed the codicil in question.

No appeal was taken from the judgment admitting the original will to probate. This appeal involves only the codicil of July 10, 1945, also admitted to probate. Mrs. Holmes died in September, 1945.

Ward Morrison, Jr. was not related to Mrs. Holmes. He had been her neighbor and young friend all of his life. It was also alleged by contestants that he had been entrusted by Mrs. Holmes with handling

her business affairs and that he had used undue influence in securing the execution of the codicil leaving him the residue of her estate. The claim of undue influence has been abandoned and only lack of testamentary capacity is relied upon.

This codicil describes five specific stocks and bonds and an estimated value of each. It then mentions "various other stocks and bonds of the value of approximately $500." Savings accounts in four different banks and loan companies were mentioned.

The will of June 21, 1945 appears in the record. By it she gives her home in Geary and most of its furnishings to Ward Morrison, Jr. Numerous other bequests are made to churches, a lodge, and cash bequests were made to ten individuals. The will states that she owned property not devised in the original will and that she had not then decided what disposition she wished to make of the residue of her estate. She described Ward Morrison, Jr. as " * * * an exceptional good friend of mine since he was a mere baby and has continued to wait on me in both health and sickness."

The first witness called was a physician at the Watonga Hospital who treated Mrs. Holmes when she was admitted in May, 1945. He continued to see her regularly until her death in September. He testified that during the greater portion of the time she was in the hospital she was capable and competent to execute a will. When she entered the hospital she was suffering from hardening of the arteries and uremic poisoning and gradually grew weaker. He prescribed sedatives and a few times he gave her morphine to relieve her pain; that he had seen her at times when she seemed to be confused but not violent; that her ailments do not always affect the mind or brain; and that while she grew weaker she continued to have lucid intervals up to the time of her death and during these intervals she was as competent as when she came to the hospital. As to her mental condition at the time the codicil was executed he testified that she was thoroughly competent.

A registered nurse at the hospital for more than twenty years, took care of Mrs.

Holmes while she was a patient there. She testified that she saw nothing unusual about Mrs. Holmes' conduct the day she signed the codicil and was of the opinion that Mrs. Holmes was competent to execute the codicil which she, the nurse, signed as a witness.

Another doctor, who had practiced medicine in Watonga for fourteen years and knew Mrs. Holmes during her lifetime, testified that she was at the hospital on July 10, 1945 and was asked to go to the room of Mrs. Holmes by the attending physician and was requested to sign the codicil as a witness. She testified that Mrs. Holmes was alert and competent.

The first witness called by protestants was a registered nurse who had lived near Mrs. Holmes and had known her for many years. She served as night nurse during Mrs. Holmes stay while at the hospital and testified that under orders of Mrs. Holmes' doctor she gave her sedatives; that she did not think Mrs. Holmes was competent to make a will or to transact business at the time the codicil was executed or at any time while she was in the hospital; that the medicine given her had ruined her mentally. However, she admitted that Mrs. Holmes had lucid intervals.

A lady who had signed Mrs. Holmes' original will of June 21, 1945 testified. She had lived as a close neighbor of Mrs. Holmes in Geary for many years and went to see her in the hospital often. The codicil here involved was executed about twenty days after the original will. This witness saw her about July 5, 1945, shortly before the execution of the codicil and after June 21, when she witnessed Mrs. Holmes' original will. The testimony of this witness is strong in support of the theory that Mrs. Holmes had lucid intervals at which times she knew her property, her relatives and friends, both before and after July 10, 1945. The witness was not present on July 10, 1945, but testified:

"Q. About three times after the 21st of June, when you went to see her, she did seem to be as mentally alert as she ever had been? A. For awhile.

"Q. Yes. A. For a short time.

"Q. Well, she was alert there? She knew who her relatives were and what her property was? A. Yes, sir."

Another old friend of Mrs. Holmes in Geary who visited her often while she was in the hospital testified that while Mrs. Holmes was in the hospital she suffered delusions and that one time she complained that ants were crawling all over her while she was in bed. That was about July 4, 1945. Mrs. Holmes was very sick and unable to concentrate or talk sensibly on that occasion. However, this witness would not testify that Mrs. Holmes did not have a lucid interval when the codicil was executed.

Another witness for the contestants who had known Mrs. Holmes for many years testified that he visited her only once in the hospital some time before June 21, 1945, and thought she was incompetent to execute a will at that time.

The attorney who had prepared the original will of June 21, 1945 testified that Mrs. Holmes felt no particular obligation to her relatives except the sister to whom she gave $1,000 in her original will and her brother, James P. Cook; that she felt quite a friendship for Ward Morrison, Jr. This witness also confirmed the other witnesses on the fact that Mrs. Holmes had times when she was mentally alert and times when she seemed groggy. He said she seemed mentally alert a few days before June 21, when he took her instructions as to how to draw her original will. That was on Sunday. The following Monday or Tuesday, she was drowsy and groggy. He next saw her on the following Thursday and she was again alert mentally and on that date executed the original will. He was not present on July 10 when the codicil was executed but testified positively that she was capable at different times up to and including August 15, 1945. The following question and answer appears in his testimony:

"Q. There is no question but what, in your mind, she did have lucid periods? A. Oh, yes. Of course, I wasn't there on July 10th; I don't know. But I do know that both before and after July 10th, while she was in the hospital, at different times her mind was clear and she was mentally competent."

We are forced to the conclusion that after Mrs. Holmes entered the hospital she had lucid intervals during which she was capable of understanding the nature and consequences of her acts; of knowing her relatives and friends and the character and value of her property. She possessed testamentary capacity during such intervals.

In the case of In re Mason's Estate, 185 Okl. 278, 91 P.2d 657, 658, it is said in the third and fourth paragraphs of the syllabus as follows:

"The testamentary capacity of a testator must be determined as of the time of the making and execution of the will. In determining that question, prior and subsequent acts have bearing only to the extent of assisting in determining the mental status of the testator at the time of the execution of the will.

"It is not sufficient, to defeat a will, merely to establish that the testator was a victim of some delusion. The evidence must go further and establish that the will itself was the product of that delusion and that the testator devised his property in a way which, except for that delusion, he would not have done."

None of the witnesses for protestants being present on July 10, 1945 when the codicil was executed, could testify as to her mental condition on that day. The two doctors and the nurse who were present had an opportunity to observe her at that particular time. They all testified that in their opinion she possessed testamentary capacity on that date. Most of the witnesses for protestants testified that after she entered the hospital she had lucid intervals.

We conclude that the judgment of the trial court is not clearly against the weight of the evidence, but is amply supported by competent evidence, and is therefore affirmed.

JOHNSON, V. C. J., and WELCH, CORN, O'NEAL, WILLIAMS and BLACKBIRD, JJ., concur.

DAVISON, J., concurs in conclusion.